Richard A. Ramler
Jorden S. Ramler
Ramler Law Office, P.C.
202 West Madison
Belgrade, MT     59714
Telephone (406) 388-0150
Telefax (406) 388-6842
rramler@ramlerlaw.com
jramler@ramlerlaw.com

John Heenan
Colette B. Davies
Bishop, Heenan & Davies
1631 Zimmerman Trail
Billings, MT 59102
Telephone (406)839-9091
Telefax (406) 839-9092
jheenan@bhdlawyers.com
colette@bhdlawyers.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

_____

| | |
|---|---|
| FERNANDO CONTRERAS, | Cause No. _____ |
| Plaintiffs, | |
| vs. | |
| REMINGTON ARMS COMPANY, LLC, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendant. | |

_____

Plaintiff, Fernando Contreras, by and through his attorneys, and for their claim for relief against Defendant, Remington Arms Company, LLC, state and allege as follows:

## PARTIES

1. Plaintiff Fernando Contreras (hereinafter "Contreras") is a resident of Yellowstone County, Montana.

2. Defendant Remington Arms Company, LLC is a Delaware Corporation with its principal place of business in Madison, North Carolina.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that Plaintiff is a citizen of the State of Montana, Defendant is a corporate citizen of the State of Delaware, and the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of interest and costs.

4. This Court has personal jurisdiction over Defendant as Defendant manufactured the defective Rifle that caused injury and damage in Montana, and Defendant, at the time of placing the Rifle into the stream of commerce, could have foreseen, realized, expected, or anticipated that the product might eventually be found in Montana by reason of its nature and Defendant's marketing practices.

5. Venue is proper within the Billings Division because the incident that gives rise to this complaint occurred within Custer County, Montana.

## COMMON ALLEGATIONS

6.      Plaintiff resides in Billings, Montana, and is a citizen of the State of Montana.

7.      Defendant is engaged in the business of designing, manufacturing, assembling, distributing and selling firearms.

8.      Defendant designed, manufactured, marketed, distributed, sold and, placed into the stream of commerce, the Remington Model 700, .22-250 caliber bolt action rifle, including the action, fie control system, and safety, bearing Serial Number E6429553 (hereinafter "the Rifle"), knowing and expecting that said Rifle would be used by consumers and around members of the general public.

9.      Plaintiff was severely injured when the Rifle fired without a trigger pull upon release of the safety on March 8, 2016.

10.     The Rifle contains the "Walker" fire control system.

11.     The Rifle, with the Walker fire control system, is unreasonably dangerous and defective in that it may, and in this instance did, fire without a trigger pull upon release of the safety.

12.     Plaintiff purchased the Rifle new and owned the Rifle on March 8, 2016.

13.     On March 8, 2016, Plaintiff Contreras was hunting coyotes on a ranch located in Custer County, Montana, with Ed Chopp (hereinafter "Chopp").

14. Plaintiff was a passenger in the front seat of a pickup that was being driven by Chopp. Plaintiff saw a porcupine which he considered shooting. The rancher considered porcupines to be a nuisance. Plaintiff decided not to shoot the porcupine and brought the Rifle into the pickup with the mussel pointed down towards the floor of the pickup. It was dark and Plaintiff could not see the safety on the rifle. Plaintiff wanted to check the rifle to see whether the safety was on safe and pushed the safety forward. When he pushed the safety forward the Rifle discharged.

15. Plaintiff did not pull the trigger on the Rifle prior to the discharge.

16. The bullet struck Plaintiff in the left foot causing severe injury.

17. Chopp drove Plaintiff to the emergency room at St. Vincent Hospital in Billings, Montana.

18. Plaintiff was admitted to St. Vincent Hospital and underwent surgery. Plaintiff lost a significant portion of his left foot as a result of the defective Rifle.

19. Plaintiff's damages include past and future medical expense, mental and physical pain and suffering, loss of earnings, impaired earning capacity, permanent disability, disfigurement, loss of established course of life, and other general and special damages in an amount to be determined by the jury at trial of this action.

20. Remington's internal records show that Remington has received thousands of customer complaints that Remington rifles containing the Walker fire control have fired without a trigger pull. The total number of complaints is unknown because Remington has destroyed some of the records involving customer complaints. Between 1992 and 2004, Remington has acknowledged receiving 3,273 customer complaints of Remington rifles with Walker fire controls firing without a trigger pull, which is an average of approximately 5 unintended firings per week for 13 years. This figure represents an average of those unintended firings which are supported by documents produced by Remington of reports to Remington by its customers. Based upon information and belief, the actual number of unintended firings is much higher.

21. Remington's internal records also show that brand new Model 700 rifles fired without a trigger pull during final testing inside Remington's factory. Remington's gallery testing documents describe "Safety malfunction found in our gallery on new rifles." Between the years 1970 B 1974, an internal Remington document, under the heading "<u>Justified Complaints</u>," reports 77 brand new Model 700 rifles fired without a trigger pull "when safe is pushed off." In addition the document reported 66 brand new Model 700 rifles fired without a trigger pull when the rifle was jarred or the bolt was operated.

22. Gallery test data on brand new Model 700 rifles from documents produced of Remington's factory testing from 1974 to 1991 show 125 incidents of rifles firing without a trigger pull when the safety was released.

23. Ken Soucy was employed by Remington and held various high level positions with Remington from the 1970's and throughout the 1990's. An e-mail from Ken Soucy discussed the CNBC documentary "Remington Under Fire," which reported on defects in Remington Model 700 rifles which cause the rifles to fire without a trigger pull. Mr. Soucy states "[w]hat surprised me about the CNBC piece was their failure to mention a very damaging piece of evidence, that being the numerous FSR (fire on safety release) incidents in Remington's own factory, mostly on brand new guns. These occurred due to a tiny sliver of metal being created during the fire control assembly operation. That sliver would get lodged in a position that the trigger would not return to the neutral position. The safety was then released and Y BAM. In the field, any foreign object of about the same size could, and probably has, produced the same result. <u>If Remington has managed to shield these incidents from your discovery process, they have done a pretty thorough job of cleaning things up</u>."

24. Defendant has not produced the documents referred to by Ken Soucy in his email despite requests to do so in discovery in other Remington Model 700 litigation.

25. Remington has sold approximately 5 million Remington Model 700 rifles with the Walker fire control since 1962. All of these bolt action rifles containing the Walker fire control are unreasonably dangerous because all of them can fire without a trigger pull under various foreseeable circumstances.

26. The Walker fire control was designed with an additional internal part called a "trigger connector." The connector is "resiliently mounted", which means that it is not affixed or attached to the trigger body. The connector is held in place only by the trigger return spring and the side plates of the enclosed housing. The connector separates from the trigger body each and every time the rifle is fired, creating a gap between the two individual parts. According to Defendant's internal documents, it is foreseeable that contaminants can become trapped inside the enclosed housing, such as field debris, manufacturing scrap, burrs from the manufacturing process, lubrication that congealed that was applied at the factory, other lubrication build up, or moisture and interfere with the reliable function of the trigger connector. Other factors that can restrict the proper retraction of the connector to secure and reliable sear support position include various tolerance stack up conditions that have resulted in a binding of the trigger body, and/or the trigger connector on the side plates of the housing, binding of the connector on the trigger body, interferences between the connector and sear, and salt bleed out from powder metal parts. Defendants' records show that without a

secure and reliable sear and connector engagement, the rifles can discharge without a trigger pull.

27. The trigger connector feature used in the Walker fire control is unique in the world of firearms and has been exclusively used by Remington. No other modern firearm manufacturer has adopted this two (2) piece trigger construction.

28. Defendant has known that the Walker fire control can allow the rifle to fire without a trigger pull since at least 1947 according to Remington's internal documents. The occurrence of safety related malfunctions have been so persistent and common that Defendants have created internal acronyms to use when discussing the various ways the rifles may fire without a trigger pull. Remington's records show that the most common malfunction is what Remington has termed a "FSR," which refers to a fire on safety release.

29. Defendant's records show that other acronyms created by Defendant to describe unintended firings (without a trigger pull) are "FOS", which refers to firing off safe; "JO", or "jar off", which refers to firing if the gun is jarred or bumped; "FBO", which refers to firing on bolt opening; "FBC", which refers to firing on bolt closing: and "fails to fire", which refers a failure of the rifle to fire when the trigger is intentionally pulled but the rifle then fires when the bolt or some other part of the rifle is touched.

30. Defendant has deceived Plaintiff and the public by claiming they have no knowledge of the dangerous and defective conditions involving the use of Walker fire control. Specifically, Defendants have repeatedly falsely claimed that the Model 700 rifle cannot fire without a trigger pull unless the Walker fire control has been improperly adjusted or the rifle has been improperly maintained.

31. Defendant has also falsely claimed that no one has ever been able to replicate the unintended firing of a Model 700 without a trigger pull unless the Walker fire control has been improperly modified or improperly maintained.

32. Defendant's internal documents, including memos, committee meeting minutes, testing records, research and development records, design change requests, process record change authorization forms, customer complaint memo's, gallery test failure reports, and gun examination reports, clearly show that the Walker fire control is unreasonably dangerous and defective because it allows Remington bolt-action rifles, including Model 700 rifles, to fire without a trigger pull under various foreseeable circumstances.

33. Remington finally began manufacturing Model 700 rifles with a new fire control system called the "X Mark Pro" in 2006.  Before that time Remington considered changing the name of the "safety" rather than making the fire control safe.  A Remington internal memo of a meeting states, "One of the items discussed at this meeting was the use of the word 'safety' to describe the

mechanism used to block the trigger or the sear or the firing pin." "It was the consensus that the word 'safety' should not be used and that other terms should be submitted. Some were suggested such as, trigger block, lock, stop, interrupter snumber, disconnector, intersector, switch arrester, latch, etc."

34. A comment in a September 2, 1981 memo regarding proposed design changes to the Model 700 fire control states "Need 'safe safety!'" Remington knew that the Model 700 fire control was not safe and that they needed a "safe safety."

35. Defendant manufactured and sold the Rifle knowing that it was defective and unreasonably dangerous.

36. Defendant's false and fraudulent statements and actions taken to hide damaging internal documents from the public, including Plaintiff, were designed by Defendants to prevent inquiry and escape investigation into defects in Remington rifles. Defendant's false and fraudulent statements and actions taken to hide damaging internal documents from the public are also designed to mislead the public, including Plaintiff, and to hinder the acquisition of information concerning defects in Remington rifles. Defendant's fraudulent statements and wrongful actions prevented Plaintiff from discovering the cause of his injuries and damage.

37.   Plaintiff did not know that the Rifle or that Remington Model 700 rifles in general could fire without a trigger pull and were defective until after the incident described above.

## COUNT ONE
### Strict Liability-Design and Manufacturing Defects

38.   Plaintiff hereby incorporates by reference all above allegations as if fully set forth herein.

39.   The Rifle was in a defective condition unreasonably dangerous in violation of § 27-1-719, M.C.A. when Plaintiff purchased the Rifle and when the incident described herein occurred.

40.   At all relevant times, Defendant was engaged in the business of designing, manufacturing, assembling, distributing, and selling firearms, and in this regard, did design, manufacture, distribute, sell, and place into the stream of commerce the Rifle, knowing and expecting that the Rifle would be used by consumers including Plaintiff and members of the general public.

41.   The Rifle was expected to and did reach Plaintiff without substantial change in the condition in which it was sold. The Rifle was not modify or adjusted at any time before the incident described herein.

42.   Defendant is strictly liable to Plaintiff for Plaintiff's general and special damages resulting from Defendant's sale of the Rifle in a defective condition unreasonably dangerous.

43. Defendant's design and manufacture of the Rifle was defective and unreasonably dangerous in one or more of the following respects:

   a. In designing a fire control with a "trigger connector;"
   b. In designing a fire control with manufacturing tolerance build up.
   c. In designing a fire control that failed to include preset engagement between the trigger connector and the sear;
   d. In designing a fire control that was susceptible to the accumulation of debris, lubrication build up, moisture, freezing, and/or the accumulation of rust;
   e. In designing a fire control that was susceptible to adjustment;
   f. In designing a fire control that was susceptible to the presence of manufacturing burrs or debris;
   g. In designing a fire control that will fire without a pull of the trigger.
   h. In designing a fire control that will fire when the safety is shifted from the "safe" to the "fire" position;
   i. In designing a fire control that will fire when the bolt is cycled;
   j. In designing a fire control that will "jar off";
   k. In designing a fire control that uses improper materials, including "powdered metal" for the sear that are unusually susceptible to normal wear and tear;
   l. In manufacturing a fire control that has burrs or manufacturing debris within the fire control;
   m. In manufacturing a fire control without proper or adequate quality control procedures or checks;
   n. In the manufacture of the connector;
   o. In the manufacture of the fire control;
   p. In failing to manufacture and assemble the fire control within specification and/or tolerance;
   q. Other design and manufacturing defects.

44. Plaintiff had no knowledge of these defective and dangerous conditions and had no reason to suspect the Rifle was defective or unreasonably dangerous.

45. As a result of the defective and dangerous condition of the Rifle, Plaintiff has and will suffer past and future medical expense, mental and physical pain and suffering, loss of earnings, impaired earning capacity, permanent disability, disfigurement, loss of established course of life, and other general and special damages in an amount to be determined by the jury at trial of this action.

46. Defendants knew or should have known about the defects alleged in this Complaint and that death and/or catastrophic injuries could occur and have occurred due to defects in the Rifle. Nonetheless, the defects were not corrected by Defendant, nor did Defendant warn the public about these defects and the risks they posed.

47. Instead, Defendants deliberately and intentionally concealed such information from Plaintiff and the public. Defendant acted with malice in that Defendant had knowledge of facts and intentionally disregarded facts that created a high probability of damage to Plaintiff and deliberately proceeded to act in conscious and intentional disregard of the high probability of injury to Plaintiff, and deliberately proceeded to act with indifference to the high probability of injury to Plaintiff.

48. Defendant further knowingly made false representations concerning the safety of the Remington Model 700 rifle, and concealed material facts

concerning the fact that the rifles could fire without a trigger pull causing injury to Plaintiff.

49. As a result, Plaintiff is entitled to recover punitive damages from Defendant in an amount to be determined at trial.

## COUNT TWO
### Strict Liability-Failure to Warn

50. Plaintiff hereby incorporates by reference all of the above allegations as if fully set forth herein.

51. At all relevant times, Defendants designed, manufactured, distributed and sold the Rifle.

52. Defendant knew, or in the exercise of ordinary care should have known, of the Rifle's propensity to unexpectedly discharge without pulling the trigger, yet Defendant failed to notify or warn Plaintiff of this propensity, either before or after the purchase of the Rifle.

53. Neither Plaintiff nor the general public recognized the risks associated with the Remington Model 700 rifle without such a warning.

54. Defendant owed a duty to users including Plaintiff to adequately warn of the defect of the Remington Model 700 rifle prior to and after the sale of the product. Failure to warn Plaintiff of the risks associated with the Remington Model 700 rifle was a breach of Defendant's duties to Plaintiff to provide adequate

warnings, both before and after the sale of the defective and unreasonably dangerous product.

54. Defendant failed to warn users including Plaintiff regarding the following defects:

    a. In failing to warn users and handlers of the rifles of the potential for firings in the absence of a pull of the trigger;
    b. In failing to warn users and handlers of the risks and hazards of improper maintenance of the rifle;
    c. In failing to warn users and handlers of the risks and hazards of adjustment of the fire control;
    d. In failing to inform or advise users and handlers of the proper procedures for maintenance of the rifle; and
    e. In failing to inform or advise users and handlers of the proper procedures for adjustments to the fire control.

56. As a result of the defective and dangerous condition of the Rifle, Plaintiff suffered past and future medical expense, mental and physical pain and suffering, loss of earnings, impaired earning capacity, permanent disability, disfigurement, loss of established course of life, and other general and special damages in an amount to be determined by the jury at trial of this action.

57. Defendant knew or should have known about the defects alleged in this Complaint and that death and/or catastrophic injuries could occur and have occurred due to their failure to warn. Nonetheless, the defects were not corrected by Defendant, nor did Defendant warn the public including Plaintiff about these defects and the risks they posed.

58. Instead, Defendant deliberately and intentionally concealed such

information from Plaintiffs and the public.   Defendants acted with malice in that Defendants had knowledge of facts and intentionally disregarded facts that created a high probability of damage to Plaintiff and deliberately proceeded to act in conscious and intentional disregard of the high probability of injury to Plaintiff, and deliberately proceeded to act with indifference to the high probability of injury to Plaintiff.

59. Defendant further knowing made false representations concerning the safety of the Remington Model 700 rifle, and concealed material facts concerning the fact that the rifles could fire without a trigger pull causing injury to Plaintiff.

60. As a result, Plaintiff is entitled to recover punitive damages from Defendant in an amount to be determined at trial.

## COUNT THREE
**Violation of Montana Unfair Trade Practices and Consumer Protection Act**

61. Plaintiff hereby incorporates by reference all above allegations as if fully set forth herein.

62. Defendant engaged in unfair and deceptive acts or practices in the conduct of its commerce or trade in violation of the Montana Consumer Protection Act by:

   a. developing, manufacturing, marketing and selling to Plaintiff the Rifle despite knowledge of the defect as alleged herein and that the Rifle posed a serious safety risk to consumers like Plaintiff;

    b.    failing to recall the Rifle despite knowledge that the Rifle posed a serious safety risk to consumers like Plaintiff; and/or

    c.    failing to warn Plaintiff of the dangers of the Rifle despite knowledge that the Rifle posed serious safety risk to consumers like Plaintiff.

63. Plaintiff suffered damages as a result of Defendant's unfair and/or deceptive acts and conduct and is entitled to monetary damages including actual damages, statutory treble damages, costs and attorney's fees.

WHEREFORE, Plaintiff prays for judgment against the Defendant as follows:

1. For general and special damages in an amount to be determined at trial.

2. For statutory treble damages following trial.

3. For punitive damages in an amount to be determined at trail.

4. For Plaintiff's attorney fees following trial.

5. For costs and expenses following trial.

6. For such and further relief as the Court deems just and proper.

DATED this 30th day of May, 2017.

        Ramler Law Office, P.C.

        Bishop, Heenan & Davies

        By: /s/Richard A. Ramler
        Richard A. Ramler

## DEMAND FOR JURY TRIAL

Plaintiff, by and thought his attorneys, hereby demands a trial by jury in the above-entitled cause.

        Ramler Law Office, P.C.

        By:<u>/s/Richard A. Ramler</u>
        Richard A. Ramler
        Attorney for Plaintiff